UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
AON FINANCIAL PRODUCTS, INC. and       :
AON CORPORATION,                       :
                                       :
                    Plaintiffs,        :
                                       :
        -against-                      :       00 Civ. 5863 (GBD) (THK)
                                       :
SOCIÉTÉ GÉNÉRALE,                      :       **REPORT AND RECOMMENDATION**
                                       :
                    Defendant.         :
                                       :
-----------------------------------X
**FROM: THEODORE H. KATZ, UNITED STATES MAGISTRATE JUDGE.**
**TO: HONORABLE GEORGE B. DANIELS, UNITED STATES DISTRICT JUDGE.**

Plaintiffs in this action, Aon Financial Products, Inc. ("AFP") and Aon Corporation ("Aon") (collectively, "Plaintiffs"), seek attorneys' fees, costs, and interest from Defendant, Société Générale, following the Opinion issued by the Court (Daniels, J.) on February 22, 2005, see Aon Fin. Prods. v. Société Générale, No. 00 Civ. 5863 (GBD), 2005 WL 427535 (S.D.N.Y. Feb. 22, 2005) ("the Opinion"), which granted summary judgment in Plaintiffs' favor.[1] In the Opinion, the Court held Defendant liable pursuant to the parties' credit default swap agreement (the "Agreement") for damages in the amount of $10,000,000, based on the occurrence of a valid "Credit Event" and Plaintiffs' timely notice to Defendant of the "Credit Event." See id. at *6. The Court also concluded that the Agreement requires Defendant to indemnify Plaintiffs for costs

_____

[1] The Judgment which followed the Opinion was entered on March 4, 2005. (See Aon Fin. Prods. v. Société Générale, 00 Civ. 5863 (GBD), Clerk's Judgment, dated Mar. 4, 2005 (the "Judgment").)

COPIES MAILED
TO COUNSEL OF RECORD ON  1/19/06

incurred in enforcing the Agreement. Id. The Court referred the determination of attorneys' fees, costs, and interest to this Court for a Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and (C).

Plaintiffs claim that the Agreement's provisions require Defendant to reimburse their reasonable attorneys' fees and costs, and that they are entitled to prejudgment and postjudgment interest on the Judgment amount of $10,000,000 (the "Judgment Amount"). Defendant contends that 1) the amount of the Judgment should be reduced by the value of the obligations Plaintiffs owe under the Agreement, 2) any interest should be calculated only after subtracting the value of Plaintiffs' obligations from the Judgment Amount, and 3) attorneys' fees associated with a prior action filed by Plaintiffs were unnecessary, and thus should not be reimbursed.

Because Defendant has called into question the Judgment Amount, implicating substantive issues on various provisions of the Agreement and the parties' obligations thereunder, the scope of the Court's referral has been broadened. The Court received two sets of written submissions from the parties and heard oral argument on the issues to be resolved.

**BACKGROUND**

The complex history and factual background of this action is described in detail in the Opinion. The Agreement, entered into by

2

AFP and Société Générale on February 9, 1999,[2] is part of a series of contracts related to an original loan of $9.3 million, issued by Bear Stearns International Limited ("BSIL"), an investment company based in England, to Ecobel Land Inc. ("Ecobel"), a Philippine land development company ("the Loan Agreement"). See Aon, 2005 WL 427535, at *1. Pursuant to the Loan Agreement, Ecobel was obligated to repay $10,000,000 to BSIL on March 7, 2000, which was to be guaranteed by a surety bond (the "Surety Bond") issued by the Government Service Insurance System ("GSIS"), a Philippine government entity. See id. at *1 n.2. BSIL then entered into a credit default swap agreement with AFP, with a guarantee issued by Aon, in which AFP agreed to pay BSIL $10,000,000 upon the occurrence of a "Credit Event" which resulted in GSIS's failure to pay under the Loan Agreement.[3] See id. at *1. The Agreement between AFP and Société Générale required Defendant to pay $10,000,000 in the event that AFP became liable to BSIL upon the

---

[2] The Agreement is contained in three documents which are intended to be read together: 1) a Master Agreement, dated February 4, 1999 ("Master Agreement"), 2) a Schedule to the Master Agreement, dated February 9, 1999, and 3) a "Transaction Confirmation" letter agreement, dated March 8, 1999 ("Trans. Conf. Ltr."). (See Affidavit of Amy C. Gross, Esq., dated Apr. 1, 2005 ("Gross Aff."), Exs. E, F, & G.)

[3] Under the BSIL/AFP agreement, a qualifying Credit Event is defined as a "Failure to Pay by the Reference Entity." Id. at *1. The Reference Entity is defined as the "Government Service Insurance System (GSIS) and any Successors and assigns." Id.

occurrence of a "Credit Event."[4]  Id.

In March 2000, Ecobel failed to make payment, and GSIS denied liability under the Surety Bond. See id.  AFP then disclaimed responsibility under its agreement with BSIL, but notified Defendant that its obligations would accrue if Plaintiffs' obligations became due. See id.

Ursa Minor Limited ("Ursa"), which was assigned all of BSIL's legal and beneficial rights in a separate agreement, filed suit against AFP for breach of contract. See id.  On July 21, 2000, the District Court (Schwartz, J.) found that a Credit Event had occurred under the BSIL/AFP agreement, and held AFP and Aon liable to Ursa for $10,000,000. See Ursa Minor Ltd. v. Aon Fin. Prods., Inc. No. 00 Civ. 2474 (AGS), 2000 WL 1010278, at *7, 12 (S.D.N.Y. July 21, 2000), aff'd, 7 Fed. Appx. 129, 2001 WL 363515 (2d Cir. Apr. 11, 2001) (unpublished).

In Aon, the action at issue here, Plaintiffs sought to hold Société Générale liable under the Agreement for the $10,000,000 Plaintiffs were obligated to pay Ursa.  Specifically, Plaintiffs' Complaint alleged breach of contract and sought reimbursement and indemnification pursuant to the Agreement. (See Complaint, Aug. 8, 2000 ("Complaint"), ¶ 1.)  Count 1 of the Complaint sought indemnification for any loss Plaintiffs incurred under the BSIL/AFP

---

[4] Under the Agreement, qualifying Credit Events include a Sovereign Event, Cross Default, Failure to Pay, Repudiation, or a Restructuring. (See Trans. Conf. Ltr. ¶ 3.)  The reference entity is defined as the "Republic of Philippines and any Successors." (See id. ¶ 1.)

4

agreement as a result of the <u>Ursa</u> decision, which found that a Credit Event had occurred under that agreement and held Plaintiffs liable to Ursa for $10,000,000. (<u>See</u> <u>Ursa</u>, 2000 WL 1010278, at *7; Complaint ¶¶ 39-40.) Count 2 alleged breach of contract based on a letter from Defendant to Plaintiffs, dated April 7, 2000, in which Defendant denied liability under the Agreement because a valid Credit Event had not occurred. (<u>See</u> <u>id.</u> ¶¶ 42-43.)

The Court (Daniels, J.) found "independently, but consistent with the court's determination in <u>Ursa</u>," that GSIS's denial of liability qualified as a Credit Event under the AFP/Société Générale Agreement. <u>See</u> <u>Aon</u>, 2005 WL 427535, at *6. The Court also found that Plaintiffs timely delivered a "Credit Event Notice" to Defendant, the effect of which triggered Defendant's liability to reimburse Plaintiffs in the amount of $10,000,000. <u>See</u> <u>id.</u>

**DISCUSSION**

I.   <u>Defendant's Contention that the Judgment Amount Should be Reduced by "Deliverable Obligations"</u>

Defendant contends that before any prejudgment or postjudgment interest is calculated, the Judgment Amount must be reduced by the value of the "Deliverable Obligations" owed by Plaintiffs under the Agreement. According to Defendant, the Opinion concluded that Defendant was liable to Plaintiffs for breaching the terms of the Agreement, and specifically addressed whether a Credit Event occurred and whether Plaintiffs delivered proper notice under the Agreement. (<u>See</u> Société Générale's Memorandum Regarding Issues to

be Addressed Prior to Entry of Final Judgment, dated Aug. 15, 2005 ("Def.'s Aug. 2005 Mem."), at 1.) Defendant contends, however, that the Opinion did not determine the damages to which Plaintiffs are entitled, because the Opinion did not consider the Deliverable Obligations Plaintiffs were required to tender under the Agreement. (See id. at 2.) Defendant maintains that because the Opinion did not consider the Settlement Terms which were to have governed, or identify or value Plaintiffs' obligations under the Agreement, the Court must do so in the context of the current motion. (See id. at 8.)

Specifically, Defendant argues that as a Condition to Payment under the Agreement, the parties must comply with the Agreement's "Settlement Terms," which require Plaintiffs' delivery of a "Portfolio of Deliverable Obligations," equal in value to the Agreement's "Reference Obligation." According to Defendant, the Reference Obligation is a Philippines bond, which has a value of approximately $9,380,000 when calculated using sales data from Bloomberg screen shots for March 13, 2000 to April 14, 2000, the time frame in which Defendant denied liability under the Agreement (See Trans. Conf. Ltr. ¶ 1; Société Générale's Memorandum in Support of Its Damages Calculations, dated Oct. 5, 2005 ("Def.'s Damages Calculation Mem."), at 2.) Defendant contends that Plaintiffs have not and cannot now comply with the Agreement's settlement procedures. Therefore, the mean value of the

Agreement's Reference Obligation, approximately $9,380,000, must be deducted from the Reference Obligation's notional amount of $10,000,000, to determine Plaintiffs' damages. (See Def.'s Damages Calculation Mem. at 2.) Thus, Defendant is, in effect, asking this Court to reduce the Judgment Amount to $620,000, and then to calculate prejudgment and postjudgment interest based on this drastically reduced damages figure, rather than on the Judgment Amount of $10,000,000.

Plaintiffs respond that the Deliverable Obligations issue was submitted to Judge Daniel's and was completely rejected by the Court. (See Plaintiffs' Brief in Support of Judge Daniels' Opinion and Order and Against Defendant's Improper Motion to Reconsider, dated Aug. 15, 2005, at 3.) Plaintiffs contend the Deliverable Obligations issue was clearly discussed and argued in the parties' briefs on their original motions, and fully considered by the Court during oral argument. (See id. at 3-10.)

Viewing the Deliverable Obligations issue as fully litigated, Plaintiffs maintain that the Judgment should not be reduced by any "Deliverable Obligations" because the Opinion, in awarding Plaintiffs the full contractual amount of $10,000,000, reflects an implicit rejection of Defendant's Deliverable Obligations arguments and a conclusion that no such reductions are required. Further, Plaintiffs argue that even if they are obligated to deliver bond obligations to Defendant in order to receive payment of

$10,000,000, the Surety Bond would be deliverable.

The Court disagrees with each party's characterization of how the Deliverable Obligations issue was presented in the parties' original motions. The only issue placed before the Court was whether, in light of GSIS's failure to honor the Surety Bond, Defendant breached the Agreement by failing to indemnify Plaintiffs for the $10,000,000 owed to BSIL. The issue of Deliverable Obligations was only alluded to in the context of Defendant's argument that there had not been a Credit Event under the Agreement sufficient to trigger its liability. Because the Deliverable Obligations issue was raised only peripherally, the Court was not asked to, and did not decide expressly, what needed to be exchanged under the Agreement's Settlement Terms. But the Court did determine Defendant's obligation to indemnify Plaintiffs for $10,000,000. Therefore, any claim that Defendant is only liable for $620,000 should have been, but was not properly raised before the Court when arguing the parties' motions, and can no longer appropriately be decided in the context of the instant motion.

A.   Defendant's Liability Arguments were Rejected by the Court

Both parties sought resolution of Plaintiffs' indemnification and breach of contract claims upon motion to the District Court. On October 3, 2000, Defendant filed a Rule 12(c) Motion for Judgment on the Pleadings. Plaintiffs responded with a Motion for Summary Judgment on October 18, 2000.

In its Motion for Judgment on the Pleadings, Defendant argued that the BSIL/AFP swap agreement and the present Agreement were materially different agreements, hedging against completely different risks. (See Memorandum in Support of Defendant's Motion for Judgment on the Pleadings, dated Oct. 2, 2000 ("Def.'s 12(c) Mem."), at 1-2.) Namely, Defendant claimed that, whereas the BSIL/AFP swap agreement covered the risk of GSIS defaulting on the Surety Bond, the Agreement between the parties in this action hedged against the risk of default by the Republic of the Philippines on its own obligation. (See id. at 2.) Therefore, Defendant argued, the default on the Surety Bond did not constitute a Credit Event under the Agreement, because GSIS's default was not an action by the Republic of the Philippines. (See id. at 8-9.)

In Defendant's Reply in Support of its Motion for Judgment on the Pleadings and in Opposition to Plaintiffs' Motion for Summary Judgment, Defendant continued to argue that a Credit Event only occurs under the Agreement if there is a default on an obligation of and by the Republic of the Philippines. (See Defendant's Memorandum of Law in Reply to Plaintiffs' Opposition to Defendant's Motion for Judgment on the Pleadings and in Further Support of its Motion and in Opposition to Plaintiffs' Motion for Summary Judgment, dated Nov. 16, 2000 ("Def.'s Nov. 2000 Reply"), at 7.) In order to demonstrate that GSIS's action could not trigger a Credit Event, in its Reply Defendant footnoted its understanding of

the Agreement's Conditions to Payment and definition of Deliverable Obligations. (See id. at 8 n.5.) Defendant explained that in order to receive payment under the Agreement, Aon would be required to deliver a "Credit Event Notice" and a "Notice of Publically Available Information," and to tender Deliverable Obligations. (See id.) Defendant maintained that since "the obligations of GSIS are not the obligations of the Republic of the Philippines[,] . . . Therefore, the Surety Bond cannot constitute a Deliverable Obligation." (Id.)[5]

Later in its Reply, Defendant addressed Plaintiffs' claim that Defendant is collaterally estopped by the Ursa decision's holding — that a Credit Event occurred under the BSIL/AFP agreement — from claiming that a Credit Event did not occur under this Agreement. (See id. at 21.) In addition to arguing that there was no identity of issues in the two cases and that Defendant did not have a full and fair opportunity to participate in Ursa, Defendant argued that it was not in privity with AFP/Aon in regard to the Ecobel loan or Surety Bond. (See id. at 24-25.) As a way of illustrating the difference between the two credit derivatives, Defendant included in this section a footnote discussing the Delivery Obligations

---

[5] Defendant also gave a similar explanation of the Agreement's Conditions to Payment and several provisions from the Agreement's Settlement Terms, including the Deliverable Obligations provision, in its Reply to Plaintiffs' Rule 56.1 Statement. (See Defendant's Reply Statement of Facts Pursuant to Local Rule 56.1(b), dated Nov. 16, 2000, ¶ 17.)

provision, "For example, the 'Deliverable Obligations,' <u>i.e.</u> the instruments that will be tendered in return for payment, are materially different in the Aon/BSIL CDS and the SG/Aon CDS." (<u>See</u> <u>id.</u> at 25 n. 30.)

After the motions were briefed, the Court held oral argument. During the hearing, Defendant discussed the nature of the Agreement and claimed that Defendant was entitled to Judgment on the Pleadings because, as a matter of Philippine law, GSIS was not the Republic of the Philippines. (<u>See</u> Hearing Transcript, dated Dec. 12, 2000 ("Hearing Trans."), at 7:6-11.) Defendant argued that Aon had been sold a credit derivative which protected only against Republic of the Philippines risk, and not the type of "exotic risk" covered by the BSIL/AFP swap agreement. (<u>See</u> <u>id.</u> at 10:19-23.)

When Defendant was asked by the Court what risk the Agreement was to protect against, Defendant responded by giving an overview of the Agreement. (<u>See</u> <u>id.</u> at 15.) As Defendant explained, the Agreement used a standard derivative form. (<u>See</u> <u>id.</u>) The form first creates a Reference Entity, which in the Agreement is the Republic of the Philippines and any successors, and then specifies an Obligation. (<u>See</u> <u>id.</u>) If the Agreement is triggered, there is a default and various notices have to be sent. (<u>See</u> <u>id.</u>) Then "[Plaintiffs] would deliver deliverable obligations and [Defendant] would deliver cash." (<u>Id.</u>) Defendant concluded its overview by arguing that the underlying question for the Court was what

triggers Defendant's liability under the Agreement. (See id.) According to Defendant, the trigger under the Agreement is a default on an obligation by the Republic of the Philippines, i.e., the Reference Obligation. (See id.)

Defendant did not contest during oral argument that GSIS was an agency of the Philippine government, (see id. at 17:9-10), nor that the Republic of the Philippines guaranteed the debts of GSIS under Philippine law. (See id. at 19:2-4.) Rather, when pressed, Defendant conceded that a default on the Surety Bond could trigger liability, but only if there were a judgment against GSIS within the narrow thirteen-month term of the Agreement. (See id. at 19:11-20:1.) Defendant explained that, in its view, there were in actuality two kinds of obligations protected by the Agreement: 1) a default on a direct obligation of the Philippines, and 2) an obligation on which the Philippines' guarantee was triggered during the period covered by the Agreement. (See id. at 20:2-8.)[6]

Tellingly, Defendant admitted during oral argument that its Motion for Judgment on the Pleadings was won or lost on two issues. (See id. at 29:10-19.) First, the Court accepting that under Philippine law, the Republic of the Philippines does not include GSIS. (See id.) Second, that the Philippines' guarantee obligation

_____

[6] When further questioned by the Court, Defendant admitted that the additional requirement it had articulated — that Plaintiffs must first obtain a judgment — is not in the language of the contract, but rather was drawn from Defendant's understanding of Philippine law. (See id. at 21:4-8.)

was not triggered until "a variety of things happened, none of which happened, none of which to my knowledge have happened to this day." (Id.)

In the Opinion, the Court (Daniels, J.) granted Summary Judgment for Plaintiffs and concluded that the amount of Defendant's liability was $10,000,000. The Opinion stated that "[t]he clear intent of the parties was that Société Générale would guarantee payment to Aon and AFP on the condition that they become liable to BSIL upon the occurrence of a Credit Event." Aon, 2005 WL 427535, at *1. In so stating, the Court rejected Defendant's position as to liability, thoroughly argued in its briefs and at oral argument, that the Agreement protected only against a default by the Republic of the Philippines on its own obligation, and not against a default on the Surety Bond by GSIS. Rather, the Court concluded that for a Sovereign Event to constitute a Credit Event under the Agreement, all that was required was "that GSIS' act have the effect of causing a failure to honour [sic] an obligation *relating* to the Philippine government. GSIS' denial of liability constituted such an act." Aon, 2005 WL 427535, at *5 (emphasis in original). The Opinion also concluded that "a Credit Event occurred once GSIS refused to pay . . . ," and that "as a matter of law, GSIS' denial of liability is a valid Sovereign Event under the Agreement." See id. at *5-6.

The Opinion therefore explicitly rejected Defendant's

arguments as to liability, and Defendant's position that a default on the Surety Bond did not qualify as a Credit Event. By reaching this decision, the Court also necessarily declined to accept Defendant's argument that the Surety Bond was not an obligation of the Republic of the Philippines, and therefore was not deliverable.

Therefore, Defendant is precluded from rearguing these issues based on the law of the case. When a court has ruled on an issue, that decision should generally be adhered to in subsequent stages of the same action. See United States v. Crowley, 318 F.3d 401, 420 (2d Cir. 2003) (citing United States v. Uccio, 940 F.2d 753, 758 (2d Cir. 1991)). "Courts apply the law of the case doctrine when their prior decisions in an ongoing case either expressly resolved an issue or necessarily resolved it by implication." Aramony v. United Way of America, 254 F.3d 403, 410 (2d Cir. 2001); see also Bandes v. Harlow & Jones, Inc., 826 F. Supp. 700, 706 (2d Cir. 1993) ("The [law of the case] doctrine is applicable both to implicitly decided and explicitly decided issues.").

The Opinion clearly concluded that the obligation hedged by the Agreement was the Surety Bond, and that default on the Surety Bond occurred within the appropriate time frame to trigger Defendant's liability. Moreover, the Court found that the only reference obligation was the Surety Bond. See Aon, 2005 WL 427535, at *5.

Thus, a determination that Defendant's liability is anything

14

other than for the Judgment Amount of $10,000,000 could not be made consistent with the Opinion's conclusion that GSIS's default on the Surety Bond, and the Philippines' subsequent rejection of its guarantee, triggered Defendant's liability to indemnify Plaintiffs for the $10,000,000 owed to BSIL, and is precluded by the law of the case.

### B. Defendant's Reframing of its Liability Arguments in terms of Plaintiffs' Deliverable Obligations is Untimely

Having been found liable to indemnify Plaintiffs for the $10,000,000 owed under the BSIL/AFP swap agreement, Defendant now seeks a second bite at the apple. Defendant argues that even if it is liable under the Agreement, the extent of its liability can only be $620,000, because of the need to offset the value of the Deliverable Obligations. Defendant contends that it raised this issue before Judge Daniels, but that he failed to address it. In fact, Defendant actually offers a new argument which should have been raised earlier and cannot be raised at this stage in the litigation.

As demonstrated by Defendant's 12(c) Memorandum of Law, Defendant's November 2000 Reply, and the hearing held before Judge Daniels, Defendant put the issue of the Agreement's settlement procedures and Plaintiffs' Deliverable Obligations before the Court in only the most off-handed manner.[7] Neither party addressed the

---

[7] There is no indication, from the Opinion or otherwise, that Defendant ever demanded or set terms for Physical Settlement

15

Deliverable Obligations issue expressly in their initial motions to the Court. Defendant did use the term "Deliverable Obligations" twice in its November 2000 Reply, but both times the term was buried in the Reply's footnotes.[8] The footnotes do not appear to have been responded to in Plaintiffs' briefs.

Further, the Agreement's Deliverable Obligations were mentioned only peripherally before Judge Daniels during oral argument. At one point, when explaining the terms of the Agreement, Defendant briefly mentioned Plaintiffs' Deliverable Obligations. (See Hearing Trans. at 15:21-23.) However, this mention was made in the context of arguing about the interpretation of the Agreement's Reference Obligation and whether the Agreement covered the Philippines' guarantee of GSIS's obligations. Defendant did not pursue the issue at the hearing or request to brief the issue in the supplemental letter briefs the parties

---

under the Agreement. Rather, Defendant simply denied that a Credit Event had occurred. See Aon, 2005 WL 427535, at *2 n.7.

[8] As discussed above, one footnote merely used the "Deliverable Obligations" issue as an example of why there was no privity between the parties based on the BSIL/AFP swap and the Agreement. (See Def.'s Nov. 2000 Reply at 25 n. 30.) In the other footnote, the Deliverable Obligations issue seems to have been referenced to reenforce Defendant's argument that the BSIL/AFP swap agreement, including its definition of a Credit Event, did not mirror this Agreement. (See id. at 8 n.5.) This second footnote makes no mention of the Agreement's settlement procedures and does not argue that any judgment amount must be offset by the Agreement's Deliverable Obligations. (See id.)

submitted to the Court after oral argument. (See id. at 59.)[9]

Having made only marginal mention of the Deliverable Obligations issue in response to Plaintiffs' motion to be indemnified in the amount of $10,000,000, and having failed to seek reconsideration of the decision finding Defendant liable to indemnify Plaintiffs in the amount of $10,000,000, Defendant now seeks to have the $10,000,000 Judgment Amount reduced by more than $9,000,000. The Court finds no basis for doing so at this stage in the litigation.

Société Générale litigated and lost Plaintiffs' indemnification and breach of contract claims. See Aon, 2005 WL 427535, at *6. The Court held that Defendant's were obligated to indemnify Plaintiffs in the amount of $10,000,000 under the Agreement. See id. The Opinion explicitly stated:

> It is undisputed that the [Agreement] between the parties obligates Société Générale to pay AFP $10,000,000 upon receipt of notice that a Credit Event has occurred. The Agreement is valid and binding between the parties. There is no claim that [P]laintiffs breached their obligations under the Agreement.

Aon, 2005 WL 427535, at *2. By reframing its previous, rejected arguments on liability as an issue pertaining to Plaintiffs'

---

[9] At one point during oral argument, Defendant characterized Plaintiffs' obligations under the Agreement were "not a today issue." (See id. at 24:17-20.) The Court finds it difficult to discern how an argument that a $10,000,000 liability should be reduced to $620,000 is an argument that should be saved for a later day.

settlement obligations under the Agreement, Defendant's stance amounts procedurally to asking the Court to reconsider the Opinion. Such a request is untimely. A motion for reconsideration of a court order that results in a judgment must be filed within ten days after the entry of the judgment. See Southern District of New York Local Civil Rule 6.3. Moreover, a memorandum in support of any motion for reconsideration must set forth the matters or controlling decisions counsel believes the court overlooked. Id.

The Opinion was issued on February 22, 2005, and the Judgment was entered on March 4, 2005. Defendant had until March 14, 2005 to move for reconsideration. Defendant did not do so. Instead, Defendant filed a Notice of Appeal on March 16, 2005, two days after the deadline for filing a motion for reconsideration had passed.[10] Thus, any attempt at seeking reconsideration at this juncture is untimely.

Further, even if a Motion for Reconsideration had been timely made, the Deliverable Obligations issue was not properly put before the Court in the parties' original motions. The standard for granting a motion for reconsideration is strict, and "will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked - matters, in other words, that might reasonably be expected to alter the

---

[10] The appeal was subsequently withdrawn on July 20, 2005, pursuant to Fed. R. Civ. P. 42(b).

conclusion reached by the court." Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995). A motion to reconsider should not raise issues or arguments not previously presented to the court. See Treppel v. Biovail Corp., No. 03 Civ. 3002 (PKL), 2005 WL 427538, at *3 (S.D.N.Y. Feb. 22, 2005). "[A] party seeking reconsideration 'is not supposed to treat the court's initial decision as the opening of a dialogue in which that party may then use such a motion to advance new theories or adduce new evidence in response to the court's rulings.'" Id. (citation omitted); see also United States v. Demosthene, 326 F. Supp. 2d 531, 534 (S.D.N.Y. 2004) ("A motion for reconsideration is not intended to be a vehicle for a party dissatisfied with a court's ruling to advance new theories that the movant failed to advance in connection with the underlying motion, nor to secure a rehearing on the merits with regard to issues already decided."). This is precisely what Defendant is trying to accomplish.

As noted above, the first time the Deliverable Obligations issue was mentioned was in passing in a footnote in a section of Defendant's November 2000 Reply Brief, arguing in support of its Motion for Judgment on the Pleadings. At the oral argument held subsequently, the issue was only referred to peripherally. A party cannot raise an issue for the first time in a reply to a motion. "It is well settled in the Second Circuit that a party may not raise an argument for the first time in his reply brief." Morgan v.

McElroy, 981 F. Supp. 873, 876 n.3 (S.D.N.Y. 1997); see also
Evangelista v. Ashcroft, 359 F.3d 145, 156 n.4 (2d Cir. 2004)
(observing that the Second Circuit "will not consider an argument
raised for the first time in a reply brief"); Wesley v. Alexander,
No. 99 Civ. 2168 (LAK), 2005 WL 1352593, at * 9 n.8 (S.D.N.Y. June
8, 2005) (noting that the fact that defendant raised an argument
for the first time in reply papers could be treated as waiver);
Jacobs v. Citibank, N.A., No. 01 Civ. 8436 (JSR) (KNF), 2004 WL
2389897, at *2 (S.D.N.Y. Oct. 25, 2004) ("Arguments made for the
first time in a reply memorandum of law or reply brief are,
generally, not considered by a court."); Farey-Jones v. Buckingham,
132 F. Supp. 2d 92, 100 (E.D.N.Y. 2001) ("[I]t is procedurally
improper to raise an issue . . . for the first time in reply
papers, thereby precluding the plaintiff from offering a meaningful
response."); United States v. Letscher, 83 F. Supp. 2d 367, 376 n.6
(S.D.N.Y. 1999) (noting that arguments raised only in reply in
support of motion for summary judgment could be rejected on that
basis alone).

Defendant's cursory mention of Deliverable Obligations in its
Reply, and in passing at the hearing is tantamount to having not
raised the issue.  Thus, Defendant's argument — that its duty to
pay is subject to Plaintiffs' obligations under the Agreement's
settlement procedures — is an untimely attempt, arising in the
context of a motion for attorneys' fees, costs, and interest, at an

20

end run around the Opinion and Judgment, which this Court cannot properly entertain.

C. <u>Purpose of Agreement and Parties' Intentions</u>

Although further issues need not be addressed, the Court notes that the underlying purpose of the Agreement and the intentions of the parties are clear. The timing and sequence of the transactions between BSIL and Escobel (February 4, 1999), BSIL and AFP (February 4, 1999), and AFP/Aon and Société Générale (February 9, 1999) demonstrates that the Agreement was entered into for the purpose of allowing Plaintiffs to hedge their risk with respect to the Surety Bond involved in the BSIL/AFP swap.[11] As the Opinion found, "The clear intent of the parties was that Société Générale would guarantee payment to Aon and AFP on the condition that they become liable to BSIL upon the occurrence of a Credit Event." <u>Aon</u>, 2005 WL 427535, at *1. This Court finds no support for Defendant's argument that the type of agreement entered into between AFP and

---

[11] Given the dearth of case law on credit default swaps and the increased frequency of the use of credit default swaps as financial instruments, one recent article has cautioned, "[C]redit default swaps do not have an available body of law that will implement unstated business expectations simply because of the nature of such instruments. For example, there is no common law independence principle similar to that which exists for letters of credit that can be relied upon to deliver an expected business result . . . Instead, a credit default swap is a creature of contract . . . The jurist should attempt to deliver the business expectations that drove the creation of the credit default swaps . . . ." Robert D. Aicher, et al., <u>Credit Enhancement: Letters of Credit, Guarantees, Insurance and Swaps (The Clash of Cultures)</u>, 59 Bus. Law. 897, 959 (2004).

Société Générale was not meant to protect against default on the Surety Bond.[12]

## D. Deliverable Obligations are not a Condition to Payment

Moreover, according to the plain language of the Agreement, the delivery of a "Portfolio of Deliverable Obligations" is not a Condition to Payment. In construing a contract, the question of whether the terms of a contract are clear or ambiguous is to be decided by the court as a matter of law. See Alexander & Alexander Servs., Inc. v. Underwriters at Lloyd's, London, 136 F.3d 82, 86 (2d Cir. 1998); Mellon Bank, N.A. v. United Bank Corp. of New York, 31 F.3d 113, 115 (2d Cir. 1994); Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan, 7 F.3d 1091, 1094 (2d Cir. 1993). "The Court will not disturb the contractual relationship where . . . a contract has been negotiated by sophisticated parties and its terms are clear and unambiguous." See Ursa, 2000 WL 1010278, at *6 (citing Grumman Allied Indus., Inc. V. Rohr Indus., Inc., 748 F.2d 729, 735 (2d Cir. 1984)). In interpreting a contract, courts "should reach for fair and reasonable results and where contracts are negotiated by counsel for sophisticated commercial parties,

---

[12] Defendant argues that the type of financial derivative Plaintiffs purchased under the Agreement only hedged against default by the Republic of the Philippines, and not a default on the Surety Bond by GSIS. (See Def.'s Aug. 2005 Mem. at 3.) The annual cost to Plaintiffs of the financial derivative was $328,000. (See id. at 2.) Following Defendant's logic, this means that Plaintiffs paid $328,000 annually for $620,000 worth of coverage, given that, to the Court's knowledge, the Surety Bond was the only Philippine bond Plaintiffs sought to hedge.

courts should interpret ambiguous language to realize the reasonable expectations of the ordinary businessperson." See Ursa, 2000 WL 1010278, at *7 (internal quotation marks omitted) (quoting Bank of New York v. Amoco Oil Co., 35 F.3d 643, 662 (2d Cir. 1994)). To discern the parties' intent, a court must construe the contract at issue so as to give full meaning and effect to all its provisions. See British Int'l. Ins. Co. Ltd. v. Seguros La Republica, S.A., 342 F.3d 78, 82 (2d Cir. 2003); Fulton Cogeneration Assocs. v. Niagara Mohawk Power Corp., 84 F.3d 91, 99 (2d Cir. 1996); see also Galli v. Metz, 973 F.2d 145, 149 (2d Cir. 1992) ("an interpretation that 'gives a reasonable and effective meaning to all terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect.'") (citation omitted).

The Agreement provides that upon the occurrence of a Credit Event, Plaintiffs must meet the Conditions to Payment in order to trigger Defendant's obligation to pay. The "Conditions to Payment" section of the Agreement explicitly states that "Conditions to Payment shall be satisfied when: (a) [Plaintiffs have] delivered a Credit Event Notice, and (b) [Plaintiffs have] delivered a Notice of Publicly Available Information." (Trans. Conf. Ltr. ¶ 3.)

Upon satisfaction of the Conditions to Payment, a settlement process is then triggered. (See id.) According to the "Settlement Terms" section of the Agreement, once the Conditions to Payment had

23

been satisfied, Plaintiffs were to deliver to Defendant a "Portfolio" consisting of the "Deliverable Obligations," in return for a "Physical Settlement Amount," unless delivery of the Portfolio by Plaintiffs to Defendant would be impossible or illegal. (See id. ¶¶ 4; 6(b)(v)(B)-(C).) The Portfolio is defined as "Deliverable Obligations with a stated principal amount equal to the Floating Rate Payer Calculation Amount [of $10,000,000]." (See id. ¶ 4.) A Deliverable Obligation is defined as "any bond obligations of the Reference Entity[, the Republic of Philippines and any Successors,] either directly or in its capacity as unconditional guarantor, that rank equal in priority of payment with the Reference Obligation . . . ." (Id.)

Although the meaning of certain provisions of the Agreement are difficult to discern, the Conditions to Payment provision is clear and unambiguous. A reading of the plain language of the Agreement shows that Plaintiffs' transfer of Deliverable Obligations to Defendant is not a condition precedent to Defendant's duty to pay under the Agreement. The only Conditions to Payment are the delivery of the Credit Event Notice and delivery of the Notice of Publicly Available Information. (See Trans. Conf. Ltr. ¶ 3.) The Settlement Terms section of the Agreement, which is the section referencing the Deliverable Obligations, is only looked to "[u]pon satisfaction of the Conditions of Payment . . . ." (Id.) Thus, Defendant's argument that before payment is due

Plaintiffs, any such payment must be offset by the Deliverable Obligations, contradicts the plain language of the Agreement. See Ursa, 2000 WL 1010278, at *8 (holding that delivery of the portfolio was not a condition to payment in the related transaction between BSIL and AFP, "[D]elivery is not a condition of payment under the Swap Agreement, but shall be made against payment of AFP after the conditions of such payment have been satisfied.").

The Opinion held that Plaintiffs' notice to Defendant of a valid Sovereign Event triggered Defendant's liability under the Agreement. See Aon, 2005 WL 427535, at *6.[13] As such, Plaintiffs have satisfied the Conditions to Payment under the Agreement, entitling Plaintiffs to the full Judgment Amount of $10,000,000 without regard to the Deliverable Obligations.

E. Surety Bond Satisfies the Deliverable Obligations Provision

Finally, although it need not be decided because it does not

---

[13] Defendant continues to takes issue with whether Plaintiffs satisfied the Agreement's Conditions to Payment by delivering to Defendant a Notice of Publicly Available Information. (See Def.'s Aug. 2005 Mem. at 2 n.2.) The Opinion held, "Notice of this Sovereign Event triggered [Defendant's] liability prior to the termination date." Aon, 2005 WL 427535, at *6. Moreover, during oral argument, Plaintiffs explained to the Court that enclosed with Plaintiffs' letter notifying Defendant of a Credit Event were three articles from various news agencies demonstrating that the default was publicly available information. (See Hearing Trans. at 44.) Given the Opinion's holding as to Defendant's liability under the Agreement based on Plaintiffs' satisfaction of the Conditions to Payment, see Aon, 2005 WL 427535, at *6, the current motion for attorneys' fees, costs, and interest is not the appropriate forum in which to challenge that conclusion. Any disagreements with the Opinion's conclusions can only be raised on appeal.

involve a Condition to Payment and was effectively waived when Defendant buried the issue in its Reply, it would appear that delivery of the Surety Bond would satisfy the Deliverable Obligations provision of the Agreement, although the Settlement Terms provision of the Agreement is not entirely free of ambiguity.[14] That is, even if delivery of the Portfolio consisting of the Deliverable Obligations was necessary to satisfy the Conditions to Payment, which it is not, the Surety Bond qualifies as a Deliverable Obligation.

The Agreement defines Deliverable Obligations as any bond obligations of the Republic of Philippines, or for which the Philippines is an unconditional guarantor, that rank in equal payment priority with the Reference Obligation. (See Trans. Conf. Ltr. ¶ 4.) The Opinion held that the only "reference obligation" ever issued was the Surety Bond issued by GSIS. See Aon, 2005 WL 427535, at *5. GSIS is an agency of the Philippine Government. The Surety Bond, as a GSIS-issued bond, falls squarely within the definition of Deliverable Obligations. Further, even if the Surety

---

[14] In reaching this conclusion, the Court acknowledges that the language of the Agreement is not identical to that of the BSIL/AFP swap agreement involved in Ursa. The BSIL/AFP swap agreement was clearly drafted, listing the Surety Bond as the Reference Obligation and defining that agreement's Deliverable Obligations as the Reference Obligation, i.e. the Surety Bond. (See BSIL/AFP Confirmation, dated Feb. 4, 1999, Ex. H to Gross Aff.) The Agreement here is more ambiguous, and fails to make reference to the risk the Agreement is intended to cover. Nowhere does the Agreement reference the Surety Bond, GSIS, or the BSIL/AFP swap agreement.

Bond, as a GSIS bond, is not considered a bond of the Republic, the Republic of the Philippines acts as a guarantor of GSIS's obligations under Philippine law. See id. As cited in the Opinion, § 9 of RA 656, as amended by Presidential Decree No. 245, provides that "the Government of the Republic of the Philippines hereby guarantees the fulfillment of the obligations of [GSIS] when and as they shall become due." Id. at *5 n.11. Thus, the Surety Bond falls within the definition of Deliverable Obligations: 1) as a bond issued by GSIS, and 2) as a bond issued by an entity whose obligations are guaranteed by the Republic of the Philippines.

The fact that the Surety Bond is unenforceable does not alter this conclusion. The Agreement provides that Deliverable Obligations shall not include any obligations "if the obligation of the Reference Entity thereunder is subject to any counterclaim, defense or right of set off by the Reference Entity." The swap agreement in Ursa contained a similar provision providing that "deliverable obligations do not include any obligations that are 'subject to any defenses by GSIS.'" Ursa, 2000 WL 1010278, at *8. The Court in Ursa concluded that defenses contained in the Deliverable Obligations provision were only those not already carved out by the BSIL/AFP agreement's credit event section. See id. Such is the case here as well. The Credit Event provision of the Agreement carves out the defenses of "unenforceability, illegality, impossibility or invalidity with respect to the

27

Obligation." (Trans. Conf. Ltr. ¶ 3.) Therefore, unenforceability is not a defense available under the Agreement's Deliverable Obligations provision. Any other reading of the Agreement would leave the Credit Event provision's carve-out of defenses without effect. For example, even though a Credit Event could be triggered by unenforceability, Plaintiffs would then be precluded from utilizing the Agreement's settlement procedures when facing unenforceability. Therefore, this Court reaches the same conclusion as in <u>Ursa</u>, and holds that the Surety Bond's unenforceability does not disqualify it as a Deliverable Obligation.[15]

For all of the above reasons, the Court rejects Defendant's argument that the mean value of the Reference Obligation, based upon sales data from March and April 2000, should be deducted from the Reference Obligation's notional amount of $10,000,000 to determine Plaintiffs' damages. Instead, the Court recommends that interest be calculated on the Judgment Amount of $10,000,000.

---

[15] The Agreement provides that the method of settlement is to be physical settlement unless an event beyond the control of the Plaintiffs or Defendant makes it impossible or illegal for Plaintiffs to deliver the Portfolio or for Defendant to take delivery of the Portfolio. (<u>See</u> Trans. Conf. Ltr. ¶¶ 4, 6(b)(v)(B)-(C).) Although the Surety Bond has no value, there appears to be no reason why the Surety Bond could not be delivered. Presuming that BSIL delivered or delivers the Surety Bond to AFP/Aon pursuant to <u>Ursa</u>, which held that the Surety Bond was deliverable, Plaintiffs could then deliver it to Defendant to satisfy the terms of Physical Settlement.

II. Plaintiffs' Claim for Interest

Plaintiffs claim that they are entitled to prejudgment interest on the Judgment Amount of $10,000,000 from the date of Defendant's breach of the Agreement, April 7, 2000, until the date of the Judgment, March 4, 2005, and to postjudgment interest on a going forward basis until Defendant has paid the Judgment Amount.[16]

In a diversity action in federal court, as is this action, state law determines the propriety of an award of prejudgment interest. See, e.g., Baker v. Dorfman, 239 F.3d 415, 425 (2d Cir. 2000); Schwimmer v. Allstate Ins. Co., 176 F.3d 648, 650 (2d Cir. 1999). Plaintiffs argue, and Defendant does not dispute, that, as set forth in the Agreement, New York law governs the calculation of prejudgment interest.[17] Under New York law, prejudgment interest is to be "computed from the earliest ascertainable date the cause

---

[16] Although an earlier submission by Plaintiffs claimed that prejudgment interest should be calculated based on the amount of $10,764,882.94, which includes the interest Plaintiffs' paid in the Ursa action, Plaintiffs no longer are claiming a base amount above $10,000,000. (See Affidavit of Daniel Hunger, Aon Senior Vice President and Controller, dated Aug. 15, 2005 ("Hunger Aff."), ¶ 11.)

[17] The Master Agreement states that each party irrevocably: "[S]ubmits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York." (See Master Agreement ¶ 13(b)(I).) The Agreement was signed by representatives of AFP, which has a principal place of business in New York, and Société Générale, which is incorporated in France.

of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred." N.Y. C.P.L.R. § 5001(b). Prejudgment interest is calculated at the rate of 9% per annum under New York law. See N.Y. C.P.L.R. § 5004. However, if a "contract between the parties provides for a different rate, that rate shall control." Morse/Diesel, Inc. v. Trinity Indus., Inc., 875 F. Supp. 165, 174 (S.D.N.Y. 1994) (citing Marine Mgmt., Inc. v. Seco Mgmt., Inc., 176 A.D.2d 252, 256, 574 N.Y.S.2d 207, 208 (2d Dep't 1991)); accord Fin. One Pub. Co., Ltd. v. Lehman Bros. Special Fin., Inc., No. 00 Civ. 6739 (CBM), 2003 WL 21638214, at *1 (S.D.N.Y. July 11, 2003); Nuera Commc'n, Inc. v. Telron Commc'n USA, Inc., No. 00 Civ. 9167 (RMB)(FM), 2002 WL 31778796, at *3 (S.D.N.Y. Nov. 15, 2002); In re Crazy Eddie Sec. Litig., 948 F. Supp. 1154, 1167 (E.D.N.Y. 1996).

"Postjudgment interest serves as a means to 'compensate the successful plaintiff for being deprived of compensation for the loss from the time between the ascertainment of damage and the payment by defendant.'" See Westinghouse Credit Corp. v. D'Urso, 371 F.3d 96, 101 (2d Cir. 2004) (quoting Kaiser Aluminum & Chem. Corp. v. Bonjorno, 494 U.S. 827, 835-36, 110 S. Ct. 1570, 1576 (1990)). "The award of postjudgment interest is mandatory on awards in civil cases as of the date the judgment is entered." Lewis v. Whelan, 99 F.3d 542, 545 (2d Cir. 1996) (citing 28 U.S.C § 1961(a)). "[F]ederal courts do not have a free hand to fashion

postjudgment interest awards to fit the equities of a case.  Rather . . . when the animating principle suggests one result and the statute another, the statute controls."  Andrulonis v. United States, 26 F.3d 1224, 1230 (2d Cir. 1994).

Although the mandatory language in § 1961(a) limits district courts in exercising discretion over the rate of postjudgment interest, private parties are permitted to set their own rates through contract.  See Westinghouse, 371 F.3d at 101.  However, for such contracts to be enforced, they must "actually indicate the parties' intent to deviate from § 1961."  Id. at 102.  "The general rule under New York and federal law is that a debt created by contract merges with a judgment entered on that contract, so that the contract debt is extinguished and only the judgment debt survives."  Id.  Under New York law, "contract language stating that a particular interest rate will accrue on a debt until the date of payment is interpreted as applying to the debt itself, not to any judgment into which the debt is merged."  Id. (quoting Marine Mgmt, Inc. v. Seco Mgmt.  Inc., 176 A.D.2d 252, 574 N.Y.S.2d 207, 208 (2d Dep't 1991)).  If parties want to override the general rule on merger of the contract debt into the judgment, they must express such intent through "clear, unambiguous and unequivocal" language. Westinghouse, 371 F.3d at 102 (quoting Banque Nationale de Paris v. 1567 Broadway Ownership Assocs., 248 A.D.2d 154, 669 N.Y.S.2d 568 (1st Dep't 1998)).

Paragraph 2(e) of the Master Agreement states in pertinent part:

> [A] party that defaults in the performance of any payment obligation will . . . be required to pay interest (before as well as after judgment) on the overdue amount to the other party . . . for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate.

(Master Agreement ¶ 2(e).) The "Default Rate," is a "rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum." (Id. ¶ 14.)

The Master Agreement clearly contemplates both prejudgment interest and postjudgment interest in the case of default. (See id. ¶ 2(e).) Paragraph 2(e) sets out in clear and unambiguous language that interest before and after any judgment is to be paid using the Default Rate defined in the Master Agreement - an annual rate equal to the cost to the prevailing party of funding the amount owed plus 1%. Because the parties explicitly provided for a rate different from the statutory rate for the calculation of prejudgment and postjudgment interest, the Master Agreement's Default Rate controls.

The parties agree that Plaintiffs' funding "rate per annum" should be calculated using 1) the daily federal funds rate, plus 2) Plaintiffs' borrowing premium, which is the interest rate premium over the federal funds rate Plaintiffs would be charged in the marketplace. (See Hunger Aff. ¶¶ 6-7; Def.'s Damages Calculation

32

Mem. at 2 & Ex. A n.1.)[18]  To calculate the Default Rate, a premium

of 1% per annum is then added to Plaintiffs' "rate per annum." (See

Hunger Aff. ¶ 8.)  This results in a Default Rate for prejudgment

and postjudgment interest ranging from 2.692% to 7.725%, which,

according to the Agreement, is calculated on the basis of daily

compounding. (See Master Agreement ¶ 2(e).)

Defendant rejected Plaintiffs' demand for payment under the

Agreement by letter dated April 7, 2000, thus breaching the

Agreement. See Aon, 2005 WL 427535, at *2 n.7.  Both parties have

used April 7, 2000 as the starting date for the accrual of

interest. (See Hunger Aff. ¶ 9; Def.'s Damages Calculation Mem. at

2.)  Therefore, the Court recommends an award of prejudgment and

postjudgment interest on the Judgment Amount of $10,000,000,

commencing on April 7, 2000, to be calculated at the Default Rate.

As of December 30, 2005, the prejudgment and postjudgment interest

due Plaintiffs on the $10,000,000 Judgment Amount based upon the

Default Rate was $2,789,288.[19]

---

[18] Plaintiffs assert, and Defendant does not disagree, that
Plaintiffs' borrowing premium is as follows: 0.200% (04/07/00-
5/15/00); 0.225% (05/16/00-01/02/01); 0.250% (01/03/01-03/19/01);
0.400% (03/20/01-04/17/01); 0.250% (04/18/01-11/05/01); 0.325%
(11/06/01-12/10/01); 0.438% (12/11/01-11/05/02); 0.603%
(11/06/02-06/24/03); 0.692% (06/25/03-06/29/04); 0.750%
(06/30/04-02/01/05); 0.625% (02/02/05-present). (See Hunger Aff.,
Ex 2.)

[19] This figure was derived using the interest calculations
provided by Plaintiffs in Ex. 2 to the Hunger Aff.  According to
Plaintiffs' calculations, interest based on the Judgment Amount
of $10,000,000 through August 12, 2005 amounted to $2,524,905.

III.  Plaintiffs' Claim for Attorneys' Fees

Plaintiffs claim they are entitled to all submitted attorneys' fees and costs they incurred in enforcing and protecting their rights under the Agreement.  Defendant contends that Plaintiffs are not entitled to the portion of costs and fees incurred in a prior action in the Northern District of Illinois, in which Plaintiffs sought a declaratory judgment against BSIL and Defendant.

Fed. R. Civ. P. 54(d) allows motions for recovery of attorneys' fees if there is a statute, rule or other grounds entitling the moving party to attorneys' fees.  "Claims for attorneys' fees . . . shall be made by motion unless the substantive law governing the action provides for the recovery of such fees . . ." Fed. R. Civ. P. 54(d)(2)(A).  The Court may award costs, other than attorneys' fees, as a matter of course to a prevailing party. See Fed. R. Civ. P. 54(d)(1).

Under New York law, "[a]ttorneys' fees are the ordinary incidents of litigation and may not be awarded to the prevailing party unless authorized by agreement between the parties, statute, or court rule." See Oscar Gruss & Son, Inc. v. Hollander, 337 F.3d

---

The Court brought this calculation forward to December 30, 2005 using federal fund rates of 3.50% (08/13/05-09/19/05), 3.75% (09/20/05-10/31/05), 4.00% (11/01/05-12/12/05), and 4.25% (12/13/05-12/30/05).  The Court then added to the relevant federal fund rate an additional 1.0%, and Plaintiffs' borrowing premium of 0.625%, which Plaintiffs listed as their borrowing premium from February 2, 2005 to August 12, 2005. (See Hunger Aff., Ex. 2.)  Interest was then calculated based on daily compounding.

186, 199 (2d Cir. 2003). A court should only award attorneys' fees for a breach of contract where the intentions of the parties to do so are "unmistakably clear from the language of the contract." Id. (citing Hooper Assocs., Ltd v. AGS Computers, Inc., 74 N.Y.2d 487, 492, 548 N.Y.S.2d 365, 548 (1989)). Plaintiffs base their claim for attorneys' fees and costs on paragraph 11 of the Master Agreement which states:

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all *reasonable out-of-pocket expenses, including legal fees* and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement. . . .

(Master Agreement ¶ 11) (emphasis added.) The Master Agreement clearly contemplates the award of attorneys' fees and costs to the prevailing party in an action to enforce the Agreement.

"[W]hen a contract provides that in the event of litigation the losing party will pay the attorneys' fees of the prevailing party, the court will order the losing party to pay whatever amounts have been expended by the prevailing party, so long as those amounts are not unreasonable." F.H. Krear & Co. V. Nineteen Named Trustees, 810 F.2d 1250, 1263 (2d. Cir. 1987); see also Goldberg v. Blue Ridge Farms, Inc., No. 04 Civ. 5098 (CPS), 2005 WL 1796116, at *3 (S.D.N.Y. July 26, 2005); Daiwa Special Asset Corp. v. Desnick, No. 00 Civ. 3856 (SHS), 2002 WL 31767817, at *1 (S.D.N.Y. Dec. 3, 2002). In general, the lodestar method, in which the hours reasonably spent by counsel, as determined by the Court,

are multiplied by the reasonable hourly rate, is used to assess reasonableness. See F.H. Krear & Co., 810 F.2d at 1263 (citation omitted); Mar Oil, S.A., v. Morrissey, 982 F.2d 830, 841 (2d Cir. 1993). "The lodestar analysis is, however, tempered by a policy requiring that contractual provisions for the payment of attorneys' fees be strictly construed, and general language will not be sufficient to warrant an award for a type of expense that is not customarily reimbursed." F.H. Krear & Co., 810 F.2d at 1263. In this Circuit, the requesting party must submit contemporaneous time records specifying the nature of the work done, when it was done, and the time expended on various tasks. See F.H. Krear & Co., 810 F.2d at 1262; Sony Music Entm't Inc. v. Pedestal Prods., Inc., No. 01 Civ. 4033 (RLC) (FM), 2002 WL 1226861, at *4 (S.D.N.Y. Apr. 9, 2002); Pressman v. Estate of Steinvorth, 886 F. Supp. 365, 367 (S.D.N.Y. 1995); Gucci Am., Inc. v. Rebecca Gold Enters.,Inc., No. 89 Civ. 4736 (BN), 1993 WL 88270, at *3 (S.D.N.Y. Mar. 23, 1993); see also Bankers Fed. Sav. Bank FSB v. Off West Broadway Developers, 224 A.D.2d 376, 378, 638 N.Y.S.2d 72, 74 (1st Dep't 1996) (noting that an award of attorneys' fees must be predicated upon a proper and sufficient affidavit of services). "'Where adequate contemporaneous time records are not kept, the court should not award the full amount requested.'" Mar Oil, 982 F.2d at 841 (quoting F.H. Krear & Co., 810 F.2d at 1265).

Plaintiffs have submitted evidence of attorneys' fees and

costs in the total amount of $144,348.60, comprised of $138,745.00 in attorneys' fees and $5,603.60 in costs. (See Affidavit of Daniel R. Formeller, Esq., dated Mar. 17, 2005 ("Formeller Aff.") ¶ 3, Exs. 1-3.) Plaintiffs have submitted bills detailing the services rendered, hours spent, and the dates services were performed. (See id., Ex. A.) Counsel for Plaintiffs has also averred that the rates for which compensation is sought reflect the firm's standard hourly rates. (See Plaintiffs' Motion for Attorneys' Fees, Costs and Interest ("Pls.' Mot.") ¶ 10; Formeller Aff., Ex. A.) Defendant does not take issue with the hourly rates charged by Plaintiffs' counsel or with the hours billed by Plaintiffs' counsel in regard to this action. Accordingly, the information provided is sufficient to satisfy the reasonableness requirement as to Plaintiffs' counsel's hourly rates and hours billed for this action. See Sony Music, 2002 WL 1226861, at *4 (detailed monthly statements of fees and expenses associated with the action and supporting affidavit by counsel held sufficient to satisfy reasonableness requirement as to contractual attorneys' fees); Norwest Fin., Inc. v. Fernandez, 121 F. Supp. 2d 258, 262 (S.D.N.Y. 2000) (copies of detailed invoices accompanied by declaration that firm charged its usual and customary rates sufficient to satisfy reasonableness of contractual attorneys' fees); Banca Della Svizzera Italiana v. Cohen, 756 F. Supp. 805, 808 (S.D.N.Y. 1991) (reasonableness of attorneys' fees recoverable pursuant to

promissory note established by affidavit stating that attorneys' hourly rates were firm's standard rates and summary description accounting for all hours billed and the nature of the work performed).

Defendant does, however, seek the exclusion of the hours and costs expended by Plaintiffs' counsel in a prior related action. Specifically, Defendant argues that Plaintiffs are not entitled to $26,582.68 in claimed attorneys' fees and costs relating to an "unnecessary" declaratory judgment action filed by AFP against both BSIL and Société Générale in the Northern District of Illinois. (See Aon Fin. Prods. v. Bear, Stearns Int'l Ltd. and Société Générale, Complaint for Declaratory Judgment, No. 00 Civ. 1752 (N.D. Ill. Mar. 22, 2000) ("DJA"), Ex. M to Gross Aff.) In the DJA, AFP sought a declaration that a "Credit Event" had not occurred under its swap agreement with BSIL. (See id. at 6.) In the alternative, if the court found that a "Credit Event" had occurred under the BSIL/AFP agreement, AFP sought a declaration that a "Credit Event" also occurred under the Agreement with Société Générale. (Id.) According to Defendant, AFP attempted to serve Société Générale with the Complaint in this action on August 15, 2000, and then attempted to serve the Complaint in the DJA on August 25, 2000.[20] (See Gross Aff., Ex. N ¶¶ 7-8.) The DJA was

---

[20] Although the Complaint in the DJA was filed on March 22, 2000, AFP did not effect service on Société Générale until after August 25, 2000. (See Gross Aff., Exs. M & O.) The Complaint in

38

stayed on October 17, 2000, pending the outcome of this action, and was voluntarily dismissed by Plaintiffs on June 12, 2001. (See Gross Aff., Ex. O.)

Plaintiffs claim that their application for attorneys' fees and costs incurred in the DJA only relates to their efforts to enforce the Agreement with Société Générale, and does not include matters solely relating to the BSIL/AFP agreement. (See Formeller Aff. ¶ 6.) Plaintiffs further argue that the majority of the hours claimed in connection with the DJA were spent on tasks which relate to, and would have been otherwise necessary for, this action.

In determining the number of hours reasonably expended for the purpose of awarding contractual attorneys' fees, a court should consider the following guidelines: (1) hours reflecting inefficiency or duplication of services should be discounted; (2) hours that are excessive, unnecessary, or which reflect "padding" should be disallowed; (3) legal work should be differentiated from nonlegal work; (4) time spent in court should be differentiated from out-of-court services; and (5) hours claimed should be weighed against a court's own expertise as to the time required to complete such activities. See Goldberg, 2005 WL 1796116, at *3. A court may exclude claimed hours that it determines are "excessive, redundant or otherwise unnecessary." Marisol A. ex rel. Forbes v. Giuliani, 111 F. Supp. 2d 381, 389 (S.D.N.Y. 2000) (quoting Hensley v.

_____

this action was filed on August 8, 2000.

Eckerhart, 461 U.S. 424, 434, 103 S. Ct. 1933, 1939-40 (1983)); see also Goldberg, 2005 WL 1796116, at *3 ("Where the hours expended appear unreasonable, courts frequently reduce the requested award . . ."); cf. Ace Ltd v. Cigna Corp., No. 00 Civ. 9423 (WK), 2001 WL 1286247, at *7 (S.D.N.Y. Oct. 22, 2001) (applying a 50% across-the-board reduction of attorneys' claimed hours found excessive and duplicative); General Electric Co. v. Compagnie Euralair, S.A., No. 96 Civ. 0884 (SAS), 1997 WL 397627, at *4-6 (S.D.N.Y. July 3, 1997) (reducing the attorneys' fee request by 50% for, among other factors, excessive and duplicative hours).

This Court fails to find justification for Plaintiffs' filing the DJA in the Northern District of Illinois, given that the instant action was filed against Société Générale in the Southern District of New York shortly afterwards.[21] In addition, the Ursa action was filed against AFP on March 31, 2000, the same month that AFP filed the DJA, which should have put Plaintiffs on notice that the issues underlying the BSIL/AFP agreement were to be addressed in another forum. Moreover, the fact that the DJA was stayed, and

---

[21] Although no reason has been articulated by Plaintiffs for filing the DJA, the Court notes that they may have initially sought to secure the Northern District of Illinois as their preferred forum in the case against BSIL. Attorneys' fees should not be awarded for strategic forum shopping, where the expenses incurred were not necessary to the adjudication of the action. In the related Ursa action, that Court construed AFP's filing of the DJA in Illinois as a preemptive strike and noted that "the federal declaratory judgment is not a prize to the winner of a race to the courthouse." Ursa, 2000 WL 1010278, at *10.

then voluntarily dismissed by Plaintiffs, further demonstrates that it was not necessary for the enforcement of the parties' Agreement.

Nevertheless, after completing a thorough review of Plaintiffs' submissions, the Court finds that a portion of the hours claimed under the DJA bills was spent on general research on the agreements and relevant legal standards, as well as correspondence with clients, all of which were pertinent to the preparation and litigation of this action. These efforts were not later duplicated in this action (see Formeller Aff., Exs. 1 & 3), and Aon's invoices do not reflect double-dipping in the two actions.[22] By contrast, the claimed hours and fees in the DJA invoices that directly relate to the pleadings, court appearances, and service of process in that action, represent unnecessary costs and should be excluded from any award of fees. After accounting for the allowable claimed hours, the Court finds that Plaintiffs should be awarded $12,298 in fees and costs associated with the DJA. The remainder of the DJA bills claiming $15,099.68 in fees, plus $815 in costs associated with the DJA (see Formeller Aff., Ex. 2), are unreasonable and should not be reimbursed.

Accordingly, the Court respectfully recommends that Plaintiffs be awarded a total of $128,917.42 in attorneys' fees and costs.

---

[22] A number of items listed in the DJA action appear to directly relate to the filing of the Aon action Complaint, purportedly due to an error in the recorded billing number. Those items, which are not duplicated in the Aon bills, have also been included in the total allowable claim for the DJA.

**CONCLUSION**

For the reasons set forth above, this Court recommends that Plaintiffs be awarded $128,917.42 in attorneys' fees and costs, and prejudgment and postjudgment interest at the Default Rate, calculated on a Judgment Amount of $10,000,000 and commencing on April 7, 2000.

Pursuant to 28 U.S.C. 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6(a) and 6(e). Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable George B. Daniels, U.S.D.J., and to the chambers of the undersigned, Room 1660. Any requests for an extension of time for filing objections must be directed to Judge Daniels. Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140, 149-52, 106 S. Ct. 466, 472-3 (1985); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989) (per curiam).

Respectfully Submitted,

THEODORE H. KATZ
UNITED STATES MAGISTRATE JUDGE

Dated: January 19, 2006
      New York, New York

42

Copies mailed to:

Daniel Foremeller, Esq.
Tressler, Soderstrom, Maloney & Priess
Sears Tower - 22nd Floor
233 S. Wacker Drive
Chicago, IL 60606

Joanna L. Crosby, Esq.
Tressler, Soderstrom, Maloney & Priess
744 Broad Street
Suite 1510
Newark, New Jersey 07102

David M. Lindley, Esq.
Pillsbury Winthrop Shaw Pittman, LLP
1540 Broadway
New York, New York 10004